

# In the Missouri Court of Appeals
# Eastern District

## DIVISION ONE

| | | |
|---|---|---|
| CRAIG A. GILBERT, | ) | No. ED107043 |
| | ) | |
| Respondent/Cross-Appellant, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | |
| | ) | Hon. Sandra Farragut-Hemphill |
| AYSIN KOPARAN, | ) | |
| | ) | Filed: |
| Appellant/Cross-Respondent. | ) | September 17, 2019 |

Aysin Koparan ("Mother") appeals from the judgment entered on the motion of Craig Gilbert ("Father") to modify the decree of dissolution and for attorneys' fees among other various cross-motions filed by the parties. Father cross-appeals. We affirm.

Mother and Father were divorced on April 20, 2012. Pursuant to the dissolution of marriage, Mother and Father were awarded joint physical and legal custody of their two minor children. After continued litigation following dissolution, on October 24, 2016, a consent judgment on child custody was entered, whereby Mother and Father continued to share joint legal and physical custody. On December 14, 2016, Father filed a third amended motion to modify the dissolution decree, seeking sole legal and physical custody of the children. Father also obtained a temporary restraining order the same day pursuant to which Father was granted temporary physical custody of the children subject to Mother's rights of reasonable custody as well as sole legal custody with regard to medical decisions for the children. Following trial, the trial court awarded Father sole legal custody and joint

physical custody with Mother. The parties went from approximately equal custody time under the previous judgment to Father now having custody 8 out of every 14 days. The trial court awarded Mother $1,104 in monthly child support and also ordered Mother to pay Father $52,411.25 in attorneys' fees and $2,115 in costs. This appeal and cross-appeal follows.

On appeal, Mother claims the trial court erred in five ways: (1) in modifying child custody because there was no substantial evidence of new circumstances since the October 2016 consent judgment demonstrating a substantial change of such a significant nature that it directly affected the welfare of the children, (2) in misapplying the law in modifying child custody because it was plain error to use the fact that Mother exercised her right to access the legal system as a basis to find a substantial change in circumstances, (3) in misapplying the law in modifying child custody because the trial court improperly considered events and circumstances from before the prior custody decree in finding a substantial change in circumstances, (4) in allowing psychological expert, Dr. Rick Scott, to testify to inadmissible hearsay evidence and incorporating such evidence into its findings and (5) in ordering Mother to pay $52,411.25 of Father's attorneys' fees because such an order lacked competent evidence and was based upon an improper determination that changing counsel and seeking court orders was misconduct. In his cross appeal, Father claims the trial court erred and misapplied the law in its use of the Form 14 Guidelines by designating Father as the parent paying support and only giving him a 34% custody adjustment when it awarded Father more days of physical custody than Mother.

Because Mother's first three points all deal with the trial court's decision to modify custody, we will address them together. We will affirm the trial court's judgment "unless

it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law." *Morgan v. Morgan*, 497 S.W.3d 359, 363 (Mo. App. E.D. 2016). We give greater deference to the trial court's determination in child custody matters than in other cases. *Id.* Because the trial court is in a superior position to weigh the evidence and enter a judgment based on that evidence, the judgment is to be affirmed under any reasonable theory supported by the evidence. *Id.* We will not disturb the trial court's custody determination unless we are firmly convinced it is erroneous and the award is against the child's best interest. *Id.*

A party seeking a modification of legal custody must demonstrate: "(a) a *substantial* change in circumstances of the *child* or his *custodian* and (b) if the trial court finds a *substantial* change of circumstances of the child or his custodian, then the trial court must determine whether a modification is necessary to serve the best interests of the child." *Id.* at 373 (emphasis in original). Section 452.410 also requires the change in circumstances to be based upon "facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree."

With respect to a modification of legal custody, "[t]he breakdown in communication and cooperation alone is sufficient to constitute a change of circumstances warranting the modification of legal custody." *Morgan*, 497 S.W.3d at 373 (internal quotation marks omitted). A modification of legal custody "must be supported by a change in the circumstances of the parents' exercise of such custody—i.e., how they have shared the decision-making rights, responsibilities, and authority relating to the health, education, and welfare of the child." *J.F.H. v. S.L.S.*, 550 S.W.3d 532, 537 (Mo. App. E.D. 2017). Accordingly, we review the record for substantial change in circumstances as to how the

3

parties have shared the decision-making rights, responsibilities and authority relating to the children's health, education and welfare. *See id.* at 540. "We consider the parties' commonality of beliefs concerning parental decisions, the parties' ability to function as a parental unit in making those decisions and the parties' demonstrated willingness and ability to share the rights and responsibilities of raising their children." *Id.*

Here, finding that parental communication, cooperation and shared decision-making between Mother and Father continued to deteriorate after entry of the October 2016 consent judgment and finding that Father demonstrated a substantial change in circumstances such that modification was necessary to serve the children's best interest, the trial court awarded Father sole legal custody. The trial court specifically noted that shortly after the October 2016 consent judgment, Father was out of country on business when he received a message from Mother that one of the children was depressed and Mother wanted to take her to see a psychiatrist right away. Father requested that the therapist already involved in the child's care or a school counselor be contacted first, and he arranged appointments with each of them. Father took the child to the appointments, and Mother did not attend. Father shared with Mother the information he learned at the appointments.

The trial court then noted events that took place in November 2016, when the parties learned about an incident involving the same child and Father's stepson, which had occurred on a vacation three years earlier. On December 1, 2016, the therapist already involved in the child's care met with the parties to discuss the incident. Father advised Mother and the therapist that the stepson did not reside in his house, and the therapist advised that the incident was minimal and that the parties should not make a big deal out

of it. According to details in the temporary restraining order obtained by Father on December 14, 2016, the therapist advised Mother not to file a temporary restraining order and indicated she would hotline the incident to the Division of Family Services but that it would most likely be categorized at the lowest level.

Despite the advice of the therapist, Mother applied for a temporary restraining order on December 2, 2016, to prevent Father from exercising custody of the children in his home. Mother's proposed temporary restraining order stated that Father "is hereby temporarily restrained, prohibited and enjoined from directly or indirectly exercising visitation with the minor children . . . ." The court rejected this language, and the temporary restraining order instead provided that the stepson was prohibited from having any unsupervised contact with the children until further court order.

The trial court noted Mother's testimony that she did not believe Father when he told her that the stepson did not live at Father's house and that she did not believe the temporary restraining order sufficiently protected her children. As a result, after obtaining the temporary restraining order and without notice to Father, Mother obtained an ex parte order of protection against the stepson.[1] Then, at around 10:30 p.m. on December 2, 2016, the police arrived at Father's home with a copy of the order of protection. The children were in bed, and the police informed Father the children needed to be removed from the home pursuant to the order. According to the trial court, "Mother continued to orchestrate a custody plan suitable to her." The trial court noted that the next day she sent Father an email chastising him for "unnecessary drama" in response to the police and stated that he

---

[1] The record indicates that a different judge issued the order of protection than the judge who entered the TRO earlier that same day.

5

could spend time with the children if he did not bring them to his house and stayed in a hotel or with Father's parents for any overnight visits.

The trial court further noted that shortly thereafter, Mother informed Father that the same child was threatening to harm herself and that Mother was taking her to the hospital. Father was out of town and returned to see the child at the hospital. Even though the stepson was not present, Mother showed the order of protection to hospital emergency room staff which resulted in Father being unable to see the child. Father testified that his attorney arrived with a new order so that the child was permitted to leave the hospital with Father. The trial court also detailed the disagreement between Mother and Father regarding plans for the follow-up treatment for the child once she left the emergency room that day.

Even limiting our review of the events in this case to the time between the October 2016 consent judgment and the time Father filed his motion to modify on December 14, 2016, as Mother insists we must,[2] we find sufficient evidence to demonstrate a substantial change in Mother's and Father's ability to share the decision-making rights, responsibility and authority relating to the welfare of the children, especially given the deference we give the trial court in custody matters like these. Mother and Father repeatedly disagreed in response to serious events involving the children's health and welfare, and there is no reasonable indication that the parties could operate as a parental unit in response to these serious events. In fact, the evidence indicates the extreme and unilateral measures Mother

---

[2] The trial court made lengthy findings regarding events and issues between Mother and Father from the time of the dissolution and the October 2016 consent judgment and also from after the time Father filed his motion to modify in this case. Mother argues that only events from the time of the October 2016 consent judgment and the filing of Father's December 14, 2016, motion to modify should be considered for purposes of determining whether there has been a substantial change in circumstances to warrant custody modification. We need not identify the specific window of time within which to review the evidence for a substantial change in circumstances because we find no reason to reverse even upon review of the narrowest window of time as Mother claims is appropriate here.

6

was willing to take by involving police to remove the children from Father's home at 10:30 at night based upon an order of protection of which Father had no notice and then using the order of protection directed at Father's stepson to keep Father from seeing his child when she was subsequently in the Emergency Room being treated for her psychological issues.

In addition, the trial court also heard expert testimony from Dr. Scott who found Mother to exhibit prominent traits for paranoid personality and narcissism, an extreme position of not being the problem, high sensitivity to the opinions of others and a significant lack of empathy. The trial court noted Dr. Scott's opinions that Mother holds a grudge about the breakup with Father, which is a motivating factor in her unwillingness to cooperate with him in parental decisions, that Mother's conduct interferes with her ability to share responsibilities with Father and that Mother was trying to interfere with the work of the children's therapist. Father also testified that he did not believe there was anything that could be done to help Mother and Father co-parent, and the trial court, which was in a superior position to weigh the evidence and enter a judgment based on that evidence, specifically determined that since the October 2016 consent judgment, there had been "a breakdown in parental communication and cooperation such that Mother and Father are unable to reach shared parenting decisions." The trial court further found Father more likely to cooperate and involve the other parent in shared decision-making.

Mother notes that the trial court made lengthy findings regarding issues between the parties predating the October 2016 consent judgment and argues the trial court inappropriately relied on those findings as a basis for its custody modification under Section 452.410. Mother asserts that there was no substantial change in circumstances to

7

warrant modification because the issues between Mother and Father were ongoing and well-known prior to the October 2016 consent judgment. We disagree with Mother. The trial court's inclusion of certain findings in its judgment from events predating the October 2016 consent judgment does not mean those findings formed a basis for the trial court's custody modification. It seems appropriate in a case like this for the trial court to explain the background of the case and establish a baseline from which to demonstrate the substantial change in circumstances. Further, even if we assume without deciding that the trial court relied on events outside the relevant window of time, Missouri law requires us to affirm the judgment under any reasonable theory supported by the evidence. *See Morgan*, 497 S.W.3d at 363. We find sufficient evidence to support the custody modification even from the narrow window of time we rely on here. *See supra* footnote 2.

Mother further argues that trial court improperly considered the fact that she exercised her right to access the legal system in seeking a temporary restraining order and ex parte order of protection as a basis to find a substantial change in circumstances to warrant modification. She claims she should not be discredited for exercising rights fundamental to or granted by our legal system. Again, we need not decide if the trial court improperly considered the fact that Mother exercised her right to access the legal system as a basis for modification because there was sufficient evidence independent of Mother's specific exercise of those legal rights to warrant the modification. While the trial court noted that Mother chose to disregard the child's therapist and pursue both a temporary restraining order and an ex parte order of protection, it also noted that steps were taken without notice to Father and that Mother chose to enforce the order of protection by involving police to remove the children from Father's home at 10:30 p.m. at night after the

8

children were in bed.  The evidence surrounding Mother's use of the legal system, not necessarily the fact that she pursued such measures, supported the trial court's judgment in conjunction with the trial court's other findings as noted above.  Even if we exclude evidence of Mother's specific use of the legal processes, we are not convinced, firmly or otherwise, that the trial court's custody determination was erroneous and against the children's best interest.

We recognize the deference afforded the trial court on custody matters and find sufficient evidence of a substantial change in circumstances surrounding Mother and Father's ability to share the decision-making rights, responsibility and authority relating to the welfare of the children to warrant an award of sole legal custody to Father in this case.

Points I, II and III are denied.

For her fourth point on appeal, Mother claims the trial court erred in allowing psychological expert, Dr. Rick Scott, to testify as to inadmissible hearsay evidence and incorporating such evidence into its finding.

We review a trial court's determination on the admissibility of an expert's testimony for an abuse of discretion. *Peterson v. National Carriers, Inc.*, 972 S.W.2d 349, 354 (Mo. App. W.D. 1998).  An abuse of discretion occurs "when the court's ruling is clearly against the logic of the circumstances or when it is arbitrary and unreasonable." *Id*. (internal quotation marks omitted).  *Id.*  Specific to court-tried cases, the Western District has noted:

> The trial court in a court-tried case is allowed wide latitude in the admission of evidence because it is presumed that it will not give weight to evidence that is incompetent.  Because of this presumption, it is difficult to base reversible error on the erroneous admission of evidence in a court-tried case.  This courts presumes on review that inadmissible evidence is not prejudicial

unless it is clear the trial court relied on that evidence in arriving at its findings of fact and conclusions of law.

*Lee v. Lee*, 967 S.W.2d 82, 86 (Mo. App. W.D. 1998). Missouri courts have also recognized that experts necessarily acquire their knowledge and expertise from many sources, some of which are inadmissible hearsay. *See, e.g., Peterson*, 972 S.W.2d at 354. As long as the information and opinions of others upon which an expert relies serves only as a background for the expert's opinion and are not offered as independent substantive evidence, the expert should not be precluded from testifying. *Id.* "[E]vidence experts rely on in forming their opinions need not be independently admissible, so long as it is the type of evidence reasonably relied on by experts in the field and is otherwise reasonably reliable." *Id.* at 355 (internal quotation marks omitted). Here, Dr. Scott identified the information he relied upon in forming his opinions and testified that it was the type of information that he typically relies upon in conducting psychological evaluations. He explained that he relied on the information as background as part of his psychological evaluation.

Mother argues that rather than considering the hearsay to which Dr. Scott testified as background for his opinion, the trial court erred in treating it as substantive evidence and incorporating it into its findings. We disagree. First, we assume that because this was a court-tried case, the trial court did not give weight to incompetent evidence. *Lee*, 967 S.W.2d at 86. Even assuming the evidence Mother challenges was inadmissible, we presume it is not prejudicial unless it is clear that the trial court relied on that evidence in arriving at its findings and conclusions, *see id.*, and we do not find prejudice here.

While Mother claims Dr. Scott's testimony is replete with inadmissible hearsay, she only specifically identifies paragraphs 12, 24, 27, 28, 29 and 30 of the trial court's 132-

10

paragraph judgment as containing alleged hearsay as relayed into the record by Dr. Scott. Upon review of those paragraphs, we find no basis for reversal. Paragraph 12 of the trial court findings describes the revelation of the incident involving Father's stepson as well as the events that took place at the meeting with the child's therapist immediately thereafter. These events were otherwise described in Mother's and Father's trial testimony and otherwise referenced in the record in this case. Paragraphs 24, 27, 28, 29 and 30 all describe events that predate the October 2016 consent judgment. As previously noted, even limiting our review of the events in this case to the time between the October 2016 consent and the time Father filed his motion to modify on December 14, 2016, as Mother insists, we find sufficient evidence to demonstrate a substantial change in circumstances to warrant custody modification. Accordingly, we find no prejudice based on the trial court findings even if we assume the challenged evidence was inadmissible and improperly considered by the trial court.

Point IV is denied.

For her fifth point on appeal, Mother claims that the trial court erred in ordering her to pay $52,411.25 of Father's attorneys' fees. Parties in domestic relations cases generally are responsible for their own attorneys' fees. *Serafin v. Serafin*, 493 S.W.3d 897, 902 (Mo. App. E.D. 2016). Section 452.355.1, however, authorizes the trial court to award attorneys' fees upon consideration of the financial resources of both parties, the merits of the case and the actions of the parties during the pendency of the action. *Id.* The trial court has broad discretion in the award of attorneys' fees, and its ruling is presumptively correct. *Id.* at 903. We will reverse an award of attorneys' fees under Section 452.355.1 only if the trial court abuses its discretion. *Id.* "To demonstrate an abuse of discretion, the complaining

party must prove that the award is clearly against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice." *Id.*

"While an award of attorney[s'] fees must be supported by competent and substantial evidence, the trial court is considered an expert on the necessity, reasonableness, and value attorney's fees." *Id.* at 902. As such an expert, "the trial court may independently determine and award the fees it deems appropriate." *Id.* Even if a party can afford to pay his or her attorneys' fees, the trial court may still award attorneys' fees in that party's favor. *Id.* Further, when there is evidence of party's misconduct during litigation, that evidence provides a sufficient basis for an award of attorneys' fees. *Id.*

Here, the trial court found Father's reasonable attorneys' fees totaled $104,822.50 and reasonable expenses totaled $4,230, and in consideration of the relevant factors, ordered Mother to pay half of that total, or $52,411.25 in attorneys' fees and $2,115 in costs. Such an award is neither clearly against the logic of the circumstances nor so arbitrary or unreasonable as to shock one's sense of justice. The trial court explicitly found that Mother's conduct during the litigation was the primary reason for both parties incurring substantial attorneys' fees and costs. The trial court found that Mother caused the expense of additional attorneys' fees by, *inter alia*: forcing the parenting coordinator to withdraw, filing actions when she was aware of existing court orders, failing to abide by existing court orders, retaining several attorneys during litigation and using her best efforts to thwart Father's ability to exercise his period of custody and visitation. The trial court recognized that Father has greater financial resources than Mother and was clearly familiar with the parties' financial situations given its decision to modify child support. Despite the disparity in financial resources, the trial court, which is considered an expert on

12

attorneys' fees, ultimately found Mother's conduct during the litigation to be a sufficient basis to award Father a portion of his attorneys' fees, and we find no reason to disrupt that conclusion.

Point V is denied.

For his cross-appeal, Father claims the trial court erred and misapplied the law in its use of the Form 14 Guidelines by designating Father as the parent paying support and only giving him a 34% custody adjustment when it awarded Father more days of physical custody than Mother.

We will affirm the judgment here unless it is not supported by substantial evidence, it is against the weight of the evidence or it erroneously declares or applies the law. *Windsor v. Windsor*, 166 S.W.3d 623 (Mo. App. W.D. 2005). Father was awarded physical custody of the children 8 out of every 14 days or 208 days per calendar year. With respect to child support, Mother and Father each submitted a Form 14, but the trial court completed its own. Based upon the new custody schedule, the trial court found that Father would be the parent paying support and awarded him a 34% overnight custody credit and ordered him to pay $1,104 in monthly child support. The trial court did not reject the Form 14 as being unjust or inappropriate.

Father argues the trial court misapplied the law as to the Form 14 in two respects: (1) Father should be designated the parent receiving support since he has the children the majority of the time; and (2) in the alternative, in the event that this Court finds no error in designating the Father as the parent paying child support, Father should receive at least a 50% credit since he has physical custody of the children over 50% of the time. Father

13

asserts that a 50% credit would reduce his child support obligation from $1,100 per month to $600 per month.

With respect to Father's claim that he should be the parent receiving support since he has the children the majority of the time, we are not convinced. Father points to no direct authority to support his claim, only implications based upon the notes that accompany Form 14. Child support is awarded based upon consideration of all relevant factors, including the financial needs and resources of the child; the financial resources and needs of the parents; the standard of living the child would have enjoyed had the marriage not been dissolved; the physical and emotional condition of the child, and the child's educational needs; the child's physical and legal custody arrangements, including the amount of time the child spends with each parent and the reasonable expenses associated with the custody or visitation arrangements and the reasonable work-related child care expenses of each parent. Section 452.340.1. Accordingly, we find no reason to limit the availability of child support based upon custody arrangements alone. While it may be the case that the parent with fewer total overnight visits is more often ordered to pay child support to the parent with more total overnight visits, Father has failed to establish that the trial court was precluded from determining that circumstances warranted an award of child support to Mother in this case.

Father also claims that, in the alternative, the trial court erred and abused its discretion when it ordered only a 34% overnight credit when he has the children 208 nights per year and Mother has them 156. Section 452.340 establishes a method by which courts allocate and calculate child support. While a trial court may adjust a child support award up to 50% when the children spend equal or substantially equal time with parents, it must

14

do so according to the guidelines using "specific, descriptive, and numeric criteria which will result in a computation of the support obligation." Sections 452.340.8 and 452.340.11. Missouri law requires a two-step procedure to calculate and approve a child support award or modification of an award: first, the trial court calculates the presumed amount according to the Form 14 and makes a finding of this amount for the record, and then the court considers whether to rebut the presumed child support amount as being unjust or inappropriate after consideration of all relevant factors. *Woolridge v. Woolridge*, 915 S.W.2d 372, 389 (Mo. App. W.D. 1996).

Line 11 of Form 14 provides for an adjustment for a portion of amounts expended by the parent obligated to pay child support during periods of overnight visitation or custody. This line item limits the court's discretion in the first step of this two-step procedure and provides a chart designating the amount of the overnight credit to be applied. A maximum credit of 34% is used to calculate the presumed amount of child support. The notes to Form 14 indicate, "If the Court finds that application of these rules, including the line 11 credit, *are unjust and inappropriate*, it may apply an overnight visitation or custody adjustment of over 34% and up to 50% based upon the circumstances of the parties" (emphasis added). Accordingly, Form 14 does not allow a credit greater than 34% until the second step of the procedure occurs, i.e., the trial court finds that the presumed amount is unjust or inappropriate. *See also Hark v. Hark*, 567 S.W.3d 671, 676 (Mo. App. E.D. 2019).

In this case, because the trial court did not find the presumed amount unjust or inappropriate, there was no opportunity under Form 14 to apply a credit of greater than the

34% credit the trial court applied here.[3]  Father does not challenge the trial court's failure to find the presumed amount unjust or inappropriate in this case, but merely claims he should have been designated the parent to receive child support, and in the alternative, that he should have received a higher credit under Form 14.  Accordingly, he has failed to establish that the trial court misapplied the law in this case.

The notes to Form 14 also state: "The mere expenditure of substantial time with both parents does not by itself eliminate the need for support to be paid by one parent to the other; rather, the expenditure of substantial time with both parents is *merely a factor* to be considered in determining whether the presumed child support amount is *unjust or inappropriate*" (emphasis added).  Again, Father does not challenge the trial court's failure to find the presumed amount unjust or inappropriate in this case or the trial court's consideration of specific factors on this point.  In addition, the notes to Form 14 further provide: "If an award of custody results in a child or children spending substantially equal time with both parents, the adjustment for the obligated parent may be determined after considering all relevant factors, including those set forth in Assumption (12)."  Assumption (12) divides basic child support amounts into three categories:  variable expenditures, duplicated fixed expenditures and non-duplicated expenditures.  It provides, "In appropriate circumstances, the adjustment *may* be up to 50%, especially when non-duplicated fixed expenditures are paid primarily by the parent obligated to pay support"

---

[3]While the trial court did not find the presumed amount unjust or inappropriate, it did consider Father's increased custody time compared to the amount of time contemplated when the settlement agreement was incorporated into the dissolution agreement.  The trial court also considered Father's increased child-related expenses relative to the increased custody time and the increase in financial resources to both parties, specifically both Father's and Mother's increased income and that both parties have remarried and cohabitate resulting in some shared expenses.  In addition, the trial court considered that the financial needs of the minor children had decreased since the time of the dissolution judgment and noted that work-related child care costs continue to decrease as the children get older and become more self-sufficient.

(emphasis added). Father's claim on cross-appeal fails to address these expenditures, and the use of the word "may" in the notes indicates that the 50% adjustment is discretionary with the trial court, further supporting our conclusion that Father has failed to establish a misapplication of the law here.

Point on cross-appeal is denied.

Judgment affirmed.

ROBERT G. DOWD, JR., Judge

Robert M. Clayton III, P.J., concurs and concurs
in separate opinion.
Roy L. Richter, J., concurs in separate opinion.

17



# In the Missouri Court of Appeals
# Eastern District
## DIVISION ONE

CRAIG A. GILBERT,   )   No. ED107043
)
    Respondent/Cross-Appellant,   )   Appeal from the Circuit Court
)   of St. Louis County
vs.   )
)   Honorable Sandra Farragut-Hemphill
AYSIS KOPARAN,   )
)
    Appellant/Cross-Respondent.   )   FILED:   September 17, 2019

## CONCURRING OPINION

I concur but write separately to point out the fact that Missouri has yet to truly implement the "Family Court" as contemplated a quarter of a century ago. The entire concept of the Family Court revolves around "one family – one judge," which is laid out succinctly in the article, A Unified Family Court for Missouri, by Paul A. Williams. Paul A. Williams, A Unified Family Court for Missouri, 63 UMKC L. Rev. 383-427 (Spring 1995). This case demonstrates that this "model" is not followed in Missouri. At least FIVE and perhaps as many as SEVEN different judges heard matters related to the motion to modify.

The original dissolution action (and three of the adult abuse petitions) were heard by Judge Walsh. A prior adult abuse petition involving Ms. Koparan had been heard by Judge Schroeder. Since Ms. Koparan appears in the Missouri Court's case management system under three different party identifiers, it is somewhat understandable that she was assigned a different

judge for each action. This system creating multiple party identifiers makes it is hard to keep the litigants before the same Judge.[1]

Apparently Judge Walsh was "rotated out" of Family Court as of December 31, 2013 – and the case was assigned to Judge Kerr, who was obviously not fully aware of what had gone on between the parties. Judge Kerr apparently left Family Court on December 31, 2015,[2] and the case migrated to Judge Hemphill on January 1, 2016, making her the third judge to deal with the motion to modify, and even further removed from the original dissolution action and prior hearings on the motion to modify. A child protection order was entered by yet another judge where Petitioner Koparan was identified in the case management system under a "generic" ID instead of the unique identifier assigned when the original dissolution action was filed.

Multiple judges dealing with the same family will continue to be the "norm" if Missouri courts continue to use a "rotation" system moving judicial personnel in and out of the "Family Court" on a one- or two-year cycle. The statute provides the basics: judges should be those who desire to be assigned, not assigned based on a rotation or "there is an opening" in a particular division. The baseline of a four-year assignment does not guarantee that the judge who hears the original proceedings (be it a dissolution, domestic abuse, juvenile matter, etc.) will be available

---

[1] The goal of the Missouri Court Automation System is to create a unique identifier for all parties. This requires time, and in some cases research, by overworked, underpaid front line clerical staff to determine the information to be used to create an accurate, unique, party ID. That "correct" ID was created for Mother when the initial dissolution proceeding was filed. However, subsequent filings (e.g. child protection petitions) do not use the same party ID – the clerk entering the information chose "next" – which generates a party ID of "@xxxxxxxxx" (where "x" is a series of numbers). People using Case.net notice this frequently when searching records for cases involving one individual; it is difficult to determine if the party is the same in each case.

[2] This "two year rotation" flies in the face of the statute. Section 487.050, in relevant part, states:

487.050. Judges and commissioners, qualifications – reviewability-- removal, grounds-- terms.
1. To the extent feasible, judges designated as family court judges and the commissioners appointed under sections 487.020 to 487.040 shall be those who:
(1) **Desire to be so assigned**;
(2) Have the temperament necessary to deal properly with cases that come before the family court;
. . . .
5. Judges designated as family court judges **shall serve in such capacity for a term of four years** unless such judge's term is either extended at such family court judge's option or shortened with the agreement of the family court judge and the presiding judge.

(emphasis added)

2

to hear subsequent matters involving the same family, and unfortunately there are many family "issues" that can span five or ten years, but at least adhering to the four-year assignment would lessen the revolving door of judges dealing with a family and attempting to learn the history of the situation while dealing with the latest conflict.

Roy L. Richter, Judge